**TRINITY BROADCASTING OF DENVER, INC., Plaintiff–Appellant,**

**v.**

**The CITY OF WESTMINSTER, Defendant–Appellee.**

**No. 92SA113.**

Supreme Court of Colorado,
En Banc.

March 15, 1993.

As Modified on Denial of Rehearing
April 12, 1993.

**918**

William S. Finger, Robert D. Mendenhall, Frank & Finger, P.C., Evergreen, for plaintiff-appellant.

David R. Brougham, Malcolm S. Mead, Hall & Evans, Denver, for defendant-appellee.

Justice MULLARKEY delivered the Opinion of the Court.

Trinity Broadcasting of Denver, Inc. (Trinity) appeals the district court's granting of summary judgment in favor of the City of Westminster (Westminster) dismissing Trinity's claims under the Governmental Immunity Act and for inverse condemnation arising out of damage to a building built and owned by Trinity allegedly caused by water leaking from water storage tanks owned and operated by Westminster.[1] We affirm the judgment of the district court with respect to inverse condemnation and reverse its judgment concerning the Governmental Immunity Act. We also hold that the notice requirement of the Governmental Immunity Act is not facially unconstitutional and that it is not unconstitutional as applied to Trinity based on the limited facts before us.

## I.

In 1986, Trinity constructed a media center building near the top of a hill at 9020 Yates Street in Westminster. About 100 yards away at the top of this hill, Westmin-

---

1. We ordered this case transferred to this court because Trinity argued that the 180-day notice limit for filing claims under the Governmental Immunity Act, section 24–10–109, 10A C.R.S. (1988 & 1992 Supp.), is unconstitutional, violating Trinity's right of due process. This appeal was taken before July 1, 1992, and the court of appeals lacked jurisdiction over the constitutional issue. *Compare* § 13–4–102(1)(b), 6A C.R.S. (1987) (court of appeals has no jurisdiction over cases in which the constitutionality of a statute is in question) *and* § 13–4–102(1)(b), 6A C.R.S. (1992 Supp.) (court of appeals has no jurisdiction over cases in which statute is declared unconstitutional) (effective July 1, 1992).

ster owns and operates two water storage tanks, each of which has a three million gallon capacity.

In 1983, some three years before it began construction, Trinity contracted for a subsurface investigation of the building site. The contractor found no free water in its drilling samples but recommended in a November 1983 report that the building be built on piers or caissons extending into the ground rather than constructed on a pad or slab foundation. This recommendation, which was also made in September of the same year by an architectural firm, William E. Skinner & Associates, and in 1985 by a soil engineer, Raymond Stewart of Stewart Engineering, Inc., was made because of the particular soil involved. Moisture in such soil would create a high risk of structural distress in a pad foundation building. Even though the 1983 soil report found no free water in the soil, the report noted that the church building next to Trinity's site had badly heaved floors with differential vertical movement of as much as one inch.

Despite these recommendations, Trinity built its media center on a slab foundation. By October 1987, some of Trinity's employees noticed cracking in the floors and walls of the building, including at least one steel I-beam pulling out of a wall. Trinity claims that it thought that this cracking was caused by the building settling a little more than normal. In early 1988, Trinity contracted with a company called 3–D Piering to investigate. 3–D Piering reported that there seemed to be some instability in the foundation, which, without performing any tests, it thought was caused by the compressing soil. 3–D Piering installed a number of steel piers under the building in an attempt to stabilize the foundation and completed its work in the spring of 1988.

This repair work stopped the cracking for a while. In December 1988, however, the cracking began anew and, in April 1989, Trinity hired Robert Maury, a soil engineer, to investigate the cause of the cracks. In late April or early May of 1989, Maury informed Trinity that the building's distress occurred because of moisture in the soil which caused the sands in the soil to consolidate and the clays to expand, and that the probable source of that moisture was Westminster's water tanks.[2] In an affidavit, Maury stated that Trinity's personnel appeared to be surprised that the water tanks were the probable cause of the building's structural problems.

On August 31, 1989, Trinity sent a notice of claim to Westminster via registered mail pursuant to the Governmental Immunity Act, sections 24–10–1 to –120, 10A C.R.S. (1988 & 1992 Supp.). On September 18, 1989, Trinity filed a complaint in the district court alleging breach of contract and negligence against its construction company, geotechnical engineering firms, architect, and construction engineer.[3] On February 9, 1990, Trinity filed its First Amended Complaint, adding claims against Westminster under the Governmental Immunity Act and alleging inverse condemnation.[4] Westminster filed a motion for summary judgment which was initially denied but, upon motion for reconsideration, was granted. The trial court denied Trinity's subsequent motion for reconsideration.

Trinity dismissed the other defendants by stipulation pursuant to C.R.C.P. 41(a) and requested the trial court to enter an order of final judgment so that Trinity could prosecute this appeal. After judgment was entered, Trinity moved for a new trial. The trial court denied this motion, and Trinity filed its notice of appeal.[5] Because Trinity raised the issue of the constitutionality of the notice period of section

2. This opinion seemed to be based on the previous soil report of dry soil and the fact that all other soil investigations of the hilltop area had shown no groundwater.

3. The engineer who made the site inspection in 1985 was not named as a defendant in the original complaint.

4. The geotechnical engineering firm that performed the 1983 soil investigation, Colorado Soil, was named as a defendant in the original complaint, but was omitted from the amended complaint.

5. Westminster filed a motion to dismiss the appeal in the court of appeals on January 13, 1992, which was summarily denied by that court.

24–10–109, we ordered the case transferred here from the court of appeals pursuant to section 13–4–110, 6A C.R.S. (1987).

## II.

■ Initially, Westminster argues that Trinity's appeal should be dismissed as not timely filed. Specifically, Westminster argues that Trinity's dismissal of the other defendants pursuant to C.R.C.P. 41(a) converted the trial court's previous summary judgment in Westminster's favor into an appealable final judgment. Westminster reasons that Trinity's appeal should have been filed within forty-five days after it filed its Rule 41 notice.

Contrary to Trinity's assertion, C.R.C.P. 54(b) does not apply to the present case because multiple parties were not involved after the construction defendants were dismissed. Trinity conceded as much because it did not seek certification under Rule 54(b). Rule 41, however, may well apply. Rule 41 provides in relevant part:

(a) ...

(1) ... [A]n action may be dismissed by the plaintiff without order of court upon payment of costs: ... (B) by filing a stipulation of dismissal signed by all parties who have appeared in the action or by their attorneys....

(2) ... Except as provided in subsection (a)(1) of this subdivision of this Rule, an action shall not be dismissed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper....

Trinity purported to rely on Rule 41(a)(1) when it dismissed the construction defendants.

Westminster urges us to dismiss this appeal because it contends that the appeal should have been filed within forty-five days of April 1, 1991, when Trinity filed its Rule 41(a)(1) notice. Westminster's argument fails because, once an adverse party has answered or filed a motion for summary judgment, Rule 41(a) requires that a stipulation of dismissal must be signed by *all* parties who have appeared in the action, or by their attorneys. Neither Westminster nor its attorneys signed the stipulated dismissal. Rule 41(a)(2) provides that except as provided in Rule 41(a)(1), "an action shall not be dismissed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper." Because Westminster was not a party to the stipulation of dismissal, the dismissal was not done pursuant to Rule 41(a)(1), and, therefore, under Rule 41(a)(2), a court order of dismissal was necessary.

No court order appears on the Register of Actions until the June 28, 1991 order dismissing the case with prejudice as to all parties.[6] We conclude that we have jurisdiction over the appeal. Accordingly, we will address the merits of the appeal.

## III.

### A.

Trinity claims, first, that its complaint stated a claim for inverse condemnation against Westminster under Article II, Section 15 of the Colorado Constitution.[7] Trin-

---

**6.** Westminster's construction of C.R.C.P. 41(a)(1) would create a trap for the unwary. The cases cited by Westminster in support of its contention, for the most part, held that, although a final order had not been entered, an appeal was properly before the appellate court. The rule was construed in favor of the appellant in order to avoid dismissing the appeal as premature. *See, e.g., Jetco Elec. Indus., Inc. v. Gardiner,* 473 F.2d 1228 (5th Cir.1973); *Marotta v. Milestone,* 314 F.2d 242 (D.C.Cir.1963); *but see United States v. O'Neil,* 709 F.2d 361 (5th Cir.1983) (appeal of summary judgment against government's claims untimely notwithstanding pendency of severed, unresolved counterclaims). In such cases, a dismissal of the ap-

peal would only delay an inevitable hearing on the merits, because the appellant need only obtain a final order from the trial court and begin again. Here, however, such a dismissal would deny a hearing on the merits of the appeal. Such a construction of the rules would exalt form over substance, and technicalities in pleading over justice. *Jetco,* 473 F.2d at 1231. *See* C.R.C.P. 1 (the rules "shall be liberally construed to secure the just, speedy, and inexpensive determination of every action").

**7.** Article II, Section 15 of the Colorado Constitution provides, in relevant part: "Private property shall not be taken or damaged, for public or private use, without just compensation."

ity contends that floods from dams and ditches, as well as "percolating waters" (which, in more modern parlance likely would be known as "groundwater migration") from such works, have long been held to constitute "takings." While this may be true, we do not agree that, under the facts and circumstances of this case, there was a "taking." [8]

Inverse condemnation is the "taking" of private property for public or private use, without compensation, by a governmental or public entity which has refused to exercise its eminent domain power. Inverse condemnation proceedings are appropriate where the underlying activity warrants condemnation pursuant to the entity's eminent domain power.

*Kratzenstein v. Board of County Comm'rs*, 674 P.2d 1009, 1010 (Colo.App. 1983) (citations omitted). *See also State, Dept. of Health v. The Mill*, 809 P.2d 434, 437 (Colo.1991).

Trinity cites numerous cases which hold that a taking can be effected by flooding, or by the saturation of the ground by percolating water. *Pumpelly v. Green Bay and Mississippi Canal Co.*, 80 U.S. (13 Wall.) 166, 20 L.Ed. 557 (1872); *Cheyenne Airport Bd. v. Rogers*, 707 P.2d 717, 729 (Wyo.1985); *Brown v. Bessemer Irrigating Ditch Co.*, 1 Colo.N.P.Dec. 286 (1902); *Nelson v. Wilson*, 239 Minn. 164, 58 N.W.2d 330 (1953); *United States v. Kansas City Life Ins. Co.*, 339 U.S. 799, 70 S.Ct. 885, 94 L.Ed. 1277 (1950); *Manigault v. Springs*, 199 U.S. 473, 26 S.Ct. 127, 50 L.Ed. 274 (1905). We acknowledge that the saturation of land by surface water flooding or by groundwater, in the correct fact situations, can effect a taking of property. However, the present case is not such a situation.

■ The threshold question, under these facts, is whether Trinity has stated a claim for inverse condemnation. More specifically, does a taking occur when water leaks from a municipal water system storage tank into the groundwater, saturates the soil, and causes damage to the foundation of an adjacent building? [9] We conclude that, in this case, such water leakage does not effect a taking because the leakage was not a direct, natural or probable result of locating and operating a water storage tank where the tanks are located, but instead an incidental and consequential injury inflicted by Westminster's operation of the water tanks.

■ As we have said previously, inverse condemnation, as its name suggests, is the mirror-image of eminent domain. To invoke the power of eminent domain, a governmental or public instrumentality must have eminent domain power, *The Mill*, 809 P.2d 434, must intend to use the property taken for a proper public purpose, and must pay the owner just compensation for the property after giving the owner due process of law. Colo. Const., art. II, § 15; U.S. Const., amend. V. While our state's jurisprudence has not addressed the issue squarely, cases from other jurisdictions suggest that there is a difference in kind between a taking and simple negligence on the part of a governmental entity. For a governmental action to result in a taking, the consequence of the action which is alleged to be a taking must be at least a direct, natural or probable result of that action. *Barnes v. United States*, 538 F.2d 865, 871, 210 Ct.Cl. 467 (1976); *Hartwig v. United States*, 485 F.2d 615, 619–20, 202 Ct.Cl. 801 (1973); *Department of Transp. v. Castillo*, 321 A.2d 394, 395, 14 Pa. Cmwlth. 22 (1974). Therefore, the taking must be a reasonably foreseeable consequence of an authorized action. In other words, the government must have the intent to take the property or to do an act

**8.** Although the constitution prohibits both the taking and damaging of private property without just compensation, the issue of whether Trinity Broadcasting's property was "damaged" and due just compensation was not thoroughly briefed. We conclude, after reviewing the record and relevant authority, that Trinity's building was not "damaged" in the sense of Article II, Section 15. *See City of Northglenn v. Grynberg,*

846 P.2d 175 (Colo.1993); *Troiano v. Colorado Dep't of Highways,* 170 Colo. 484, 487, 463 P.2d 448, 450 (1969).

**9.** Another, less precise way of framing the question may be whether a governmental instrumentality can effect a taking through negligence.

which has the natural consequence of taking the property. *Sun Oil Co. v. United States*, 572 F.2d 786, 818, 215 Ct.Cl. 716 (1978); *J.J. Henry v. United States*, 411 F.2d 1246, 1249, 188 Ct.Cl. 39 (1969); *Sayre v. United States*, 282 F.Supp. 175, 185 (N.D.Ohio 1967); *Biggs Rental Co. v. United States*, 353 F.2d 1013, 1017, 173 Ct.Cl. 789 (1965); *B Amusement Co. v. United States*, 180 F.Supp. 386, 389, 148 Ct.Cl. 337 (1960). There is also authority for the proposition that negligence cannot be the basis of a taking. *PDTC Owners Ass'n v. Coachella Valley County Water Dist.*, 443 F.Supp. 338, 342 (C.D.Calif.1978); *Columbia Basin Orchard v. United States*, 132 F.Supp. 707, 710, 132 Ct.Cl. 445 (1955).

In the present case, Trinity complains that Westminster allowed water to leak from its water tanks or water mains. Although Trinity is not alleging negligence in its inverse condemnation claim, water tanks and water mains do not leak to the extent that a leak will cause foundation damage to a building 100 yards away in the absence of negligent operation or maintenance. Under some authority, negligent maintenance can result in a taking. *See, e.g., McMahan's v. City of Santa Monica*, 146 Cal.App.3d 683, 194 Cal.Rptr. 582 (1983) (in light of city's knowledge of the limited life of water mains, grossly inadequate maintenance program was deliberately planned act constituting a taking, resulting from broken water main). As *McMahan's* illustrates, however, simple negligence is not enough. There has been no showing in this case that Westminster was so grossly negligent as to raise its conduct to being deliberate.[10]

We conclude that Trinity has not shown that there is a triable issue of fact in its claim for inverse condemnation. *Civil Service Comm'n v. Pinder*, 812 P.2d 645, 649 (Colo.1991); *Continental Air Lines v. Keenan*, 731 P.2d 708, 712–13 (Colo.1987). Trinity did not show any evidence that Westminster intended to act, or refused to

act, in such a way that the natural consequence of its acts would result in a taking of Trinity's media center because Westminster's water saturated the soil beneath that building.

B.

Second, Trinity claims that its notice to Westminster, pursuant to the Governmental Immunity Act, section 24–10–109(1), 10A C.R.S. (1988 & 1992 Supp.), was timely. Because the trial court neither followed the proper procedure nor employed the proper legal test, we reverse and remand for further proceedings.

Section 24–10–109(1) provides, in relevant part:

> Any person claiming to have suffered an injury by a public entity or by an employee thereof while in the course of such employment ... shall file a written notice as provided in this section within one hundred eighty days after the date of the discovery of the injury, regardless of whether the person then knew all of the elements of a claim or of a cause of action for such injury.

Such notice must contain the name and address of the claimant and the public employee involved, if known, as well as a concise statement of the factual basis of the claim and the nature and extent of the injury claimed to have been suffered, and a statement of the amount of monetary damages requested. § 24–10–109(2)(a)–(e). Notice is effective upon mailing. § 24–10–109(3). The term "injury" is defined in the statute as:

> death, injury to a person, damage to or loss of property, of whatsoever kind, which, if inflicted by a private person, would lie in tort or could lie in tort regardless of whether that may be the type of action or the form of relief chosen by a claimant.

§ 24–10–103(2), 10A C.R.S. (1988).

Here, Trinity mailed notice to Westminster on August 31, 1989. The issue is

---

**10.** Although Trinity argues that Westminster did not gauge the amount of water in the tanks, and did not test the mains or the tanks for leaks until Trinity gave Westminster notice of this claim, there has been no evidence that Westminster should have known that the tanks or the mains, in the normal course of events, would have deteriorated to the point that they would be leaking in 1987 or 1988.

when did Trinity "discover[ ] ... the injury." Trinity argues that it discovered the injury in late April or early May, 1989, when Robert Maury, a geotechnical engineer hired by Trinity, discovered free water in the soil under and around Trinity's building and informed Trinity that, in his professional opinion, such water originated from the water tanks. Westminster argues, to the contrary, that Trinity discovered the injury either in September or October, 1987, when James A. Riddle, chief engineer and station operations supervisor for the Trinity Media Center, first observed cracking in the floors and walls of the building, or, in the alternative, in December, 1988, when, after repairs were made to the foundation, such cracks began to appear again.

 The Governmental Immunity Act is not a tort accrual statute. It is a nonclaim statute, raising a jurisdictional bar if notice is not given within the applicable time period. § 24–10–109(1); *Barrack v. City of Lafayette*, 847 P.2d 136 (Colo.1993); *cf.* § 15–12–803, 6B C.R.S. (1987 & 1992 Supp.) (limitations on presentation of claims against estate). In the applicable provision, the Governmental Immunity Act requires a person claiming to have suffered an injury by a public entity to file written notice within 180 days after the discovery of the injury, regardless of whether the person knew all of the elements of the claim. § 24–10–109(1), 10A C.R.S. (1988 & 1992 Supp.). Tort concepts, however, are helpful in determining when an injury is deemed to be discovered. While, under tort law, the concept of accrual encompasses both the discovery of the injury *and* the discovery of the cause of that injury, *see Mastro v. Brodie*, 682 P.2d 1162, 1168 (Colo.1984), the Governmental Immunity Act notice period is triggered when a claimant has only discovered that he or she has been wrongfully injured. *Barrack*, 847 P.2d 136; *see East Lakewood Sanitation Dist. v. District Court*, 842 P.2d 233, 235–36 (Colo.1992) (knowledge of the identity of the tortfeasor not required for running of notice period).

 The Governmental Immunity Act does not define "discovery." However, the Act's use of the term "discovery" in the context of tortious injury implicates the "discovery rule" of tort law which provides that a statute of limitations does not start to run until the time when the plaintiff knew or, through the exercise of reasonable diligence, should have known (or, alternatively, discovered or should have discovered), the wrongful act. *Compare* Black's Law Dictionary 419 (5th ed. 1979) ("The 'discovery rule' is, generally, that cause of action for medical malpractice will not be held to accrue until patient knows, or, in exercise of reasonable diligence, should have known of the alleged malpractice.") *with* Black's Law Dictionary 466 (6th ed. 1990) ("Under the 'discovery rule,' limitation statute in malpractice cases does not start to run, i.e., the cause of action does not accrue, until the date of discovery of the malpractice, or the date when, by the exercise of reasonable care and diligence, the patient should have discovered the wrongful act."). The statutes of limitation for both tort and contract claims have incorporated the "discovery rule," and use interchangeably "known or should have been known by the exercise of reasonable diligence" and "discovered or should have been discovered by the exercise of reasonable diligence." § 13–80–108, 6A C.R.S. (1987). In its 1986 amendments to the Governmental Immunity Act, the General Assembly did nothing to indicate that "discovery" under the act should mean anything other than "known or should have been known by the exercise of reasonable diligence." Ch. 166, sec. 9, § 24–10–109, 1986 Colo.Sess.Laws 873, 877. In fact, Representative Berry, one of the sponsors of the 1986 amendments, stated that the term was intended to incorporate the discovery rule:

> [W]e do want to leave the word 'discovery' in the statute and that's primarily involved in medical malpractice cases where, at Health Sciences Center or Denver General Hospital or something like this, someone has an injury because of malpractice but they're not aware of it.

Hearings on H.B. 1196, Colorado House of Representatives Fifty–Fifth General Assembly, Second Regular Session, February 26, 1986.

■ Trinity argues that summary judgment was improper because the jury must decide contested issues of fact concerning when the 180–day time period began to run. We disagree in part and hold that the trial court not the jury is the factfinder on the notice issue. However, summary judgment was not proper because this case should have been decided pursuant to C.R.C.P. 12(b)(1). There is a factual dispute between the parties concerning when Trinity discovered its injury and an evidentiary hearing is necessary to resolve that dispute.

Our conclusion that the jury is not the factfinder on the notice question is based on the statute and general principles of sovereign immunity. When a public entity claims before trial that timely notice was not given to it under the Governmental Immunity Act, the trial court is the finder of fact. The issue of timeliness of notice must be determined before trial by the court, not reserved for determination by the jury at trial. The sovereign immunity defense can be raised by answer as Westminster did or by motion to dismiss pursuant to C.R.C.P. 12(b)(1) (lack of subject matter jurisdiction). Depending on the case, the trial court may allow limited discovery and conduct an evidentiary hearing before deciding the notice issue.

The legislature characterized the notice in section 24–10–109 of the Governmental Immunity Act as a jurisdictional prerequisite. Moreover, the General Assembly provided in section 24–10–108 that issues of sovereign immunity are to be decided by the trial court if raised before trial. The relevant portion of section 24–10–108 in effect when this case arose stated:

> If a public entity raises the issue of sovereign immunity prior to or immediately after the commencement of discovery, the court shall suspend discovery, except any discovery necessary to decide the issue of sovereign immunity, and shall decide such issue on motion.

§ 24–10–108, 10A C.R.S. (1988). Unless a plaintiff complies with the statutory requirements, including notice, sovereign immunity bars suit against a public entity for injury which lies or could lie in tort. *Id.* The terms by which a sovereign (in this case, the state and its political subdivisions) consents to be sued must be strictly followed since they "define [the] court's jurisdiction to entertain the suit." *United States v. Dalm*, 494 U.S. 596, 608, 110 S.Ct. 1361, 1368, 108 L.Ed.2d 548 (1990) (citations omitted). The sovereign cannot be forced to trial if a jurisdictional prerequisite has not been met. Thus, under our statute and consistent with the general principles of sovereign immunity, the trial court is the factfinder which determines in the pretrial context whether Trinity satisfied the 180–day notice provision.

Having rejected Trinity's claim that fact questions regarding notice must be decided by the jury, we will consider next whether the trial court properly decided the matter on summary judgment without conducting an evidentiary hearing.

■ A motion to dismiss for lack of subject matter jurisdiction is governed by C.R.C.P. 12(b)(1). Our version of Rule 12(b)(1) is identical to Fed.R.Civ.P. 12(b)(1), and C.R.C.P. 12(b)(5) is identical to Fed.R.Civ.P. 12(b)(6). Accordingly, we look to federal authorities for guidance in construing our rules. *Lucas v. District Court*, 140 Colo. 510, 517, 345 P.2d 1064, 1067 (1959). If the motion is a factual attack on the jurisdictional allegations of the complaint, such as the timeliness of the notice involved in this case, the trial court may receive any competent evidence pertaining to the motion. *See* 2A James W. Moore & Jo Desha Lucas, *Moore's Federal Practice* ¶ 12.07[2.–1] at 12–47 (2d ed. 1992). Fed.R.Civ.P. 12(b)(1) differs from Fed.R.Civ.P. 12(b)(6) (motion to dismiss for failure to state a claim) because a trial court may consider evidence pursuant to Fed.R.Civ.P. 12(b)(1) without converting the motion to a summary judgment motion as it would be required to do if it considered matters outside the pleadings under a Fed.R.Civ.P. 12(b)(6) motion. Under Fed.R.Civ.P. 12(b)(1):

> Any factual dispute upon which the existence of jurisdiction may turn is for the court alone, and not a jury to determine.

Appellate review of such a factual determination is on a clearly erroneous basis. *Id.* at 12–49. The "clearly erroneous" standard of appellate review under Fed. R.Civ.P. 12(b)(1) differs greatly from the standard of appellate review used if a Fed. R.Civ.P. 12(b)(6) motion is converted to a summary judgment motion under Fed. R.Civ.P. 56. The test for summary judgment is very stringent and gives every benefit of the inferences to the non-moving party (here, the plaintiff Trinity).[11] By contrast, under Fed.R.Civ.P. 12(b)(1), the plaintiff has the burden to prove jurisdiction and the standard of appellate review is highly deferential. As the Third Circuit Court of Appeals stated:

> Under Rule 12(b)(1), the court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." ... In contrast, because a Rule 12(b)(6) motion "results in a determination on the merits at an early stage of plaintiff's case, the plaintiff is afforded the safeguard of having all its allegations taken as true and all inferences favorable to plaintiff will be drawn."

*Boyle v. Governor's Veterans Outreach & Assistance Center*, 925 F.2d 71, 74 (3d Cir. 1991) (citations omitted).

In the present case it is clear that the trial court should have treated this matter as a motion to dismiss for lack of subject matter jurisdiction under C.R.C.P. 12(b)(1). *Cizek v. United States*, 953 F.2d 1232 (10th Cir.1992) (question whether notice was properly given under Federal Tort Claims Act is properly handled under Fed.R.Civ.P. 12(b)(1), not as summary judgment under Fed.R.Civ.P. 56). Instead it proceeded under C.R.C.P. 56 concerning summary judgment. If we were satisfied that all the relevant evidence had been presented to the trial court, we could apply C.R.C.P.

12(b)(1) to the record before us as the Tenth Circuit Court of Appeals applied the corresponding federal rule in *Cizek*. No remand would be necessary.

However, we are unable to do so. The record shows that Westminster moved for summary judgment on November 5, 1990. Among other issues, it claimed that the notice given by Trinity was untimely under the Governmental Immunity Act. Westminster asserted that Trinity discovered its injury in the fall of 1987 when it discovered structural damage in the building. Westminster supported its motion with documents and deposition testimony. Trinity filed a brief in opposition on November 30, 1990. Trinity contended "that water was identified as the source of the problem, and Westminster as the source of the water, in late April or May of 1989" and that notice was given to Westminster within 180 days of that time. Trinity submitted supporting affidavits and argued that when Trinity knew or should have known of its injury was a disputed issue of fact. The trial court, agreeing with Trinity, found there were disputed issues of material fact and denied Westminster's motion for summary judgment on December 6, 1990.

Westminster moved for reconsideration of the court's ruling on December 10, 1990, arguing that it had been denied the opportunity to submit a reply brief and that there were no disputed issues of material fact. With respect to the notice issue, Westminster conceded that Trinity "waited more than two years to find out why it was having structural difficulties" but claimed that this "factual point" was irrelevant. By an order dated December 18, 1990, the trial court granted Westminster's motion for reconsideration and also granted summary judgment in its favor. It found that Trinity discovered its injury "sometime

---

**11.** "Summary judgment is a drastic remedy and is never warranted except on a clear showing that there exists no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Mancuso v. United Bank of Pueblo*, 818 P.2d 732, 736 (Colo.1991) (quoting *Churchey v. Adolph Coors Co.*, 759 P.2d 1336, 1339–40 (Colo.1988)). The moving party has the initial burden of showing that there is no genuine issue of material fact,

but after that initial burden has been met, the nonmoving party bears the burden of establishing that there is a triable issue of fact. *Id.* (citing *Continental Airlines, Inc. v. Keenan*, 731 P.2d 708, 712 (Colo.1987)). The nonmoving party receives all favorable inferences that may reasonably be drawn from the undisputed facts. *Id.* (quoting *Tapley v. Golden Big O Tires*, 676 P.2d 676, 678 (Colo.1983)).

around May of 1989." The trial court noted that Westminster was added as a defendant on February 9, 1990, and from these two facts, the trial court concluded that the notice was untimely. Apparently the trial court misread the Governmental Immunity Act as requiring suit to be filed within 180 days of the discovery of injury when the Act requires only that written notice to the public entity be given within that time period.[12]

Trinity then filed its own motion for reconsideration on December 26, 1990. It pointed out that it had given written notice to Westminster by registered letter mailed by Trinity on August 31, 1989 and received by Westminster on September 6, 1989. Thus, Trinity contended timely notice was given within 180 days of May 1989 which the trial court had found to be the time when the injury was discovered.

The trial court's analysis in its December 18, 1990 order was clearly wrong. If Trinity discovered its injury in May 1989 as the trial court found, then Trinity's notice was timely as Trinity alleged. The trial court, however, denied Trinity's motion for reconsideration in an order dated January 28, 1991. It rejected its previous finding that Trinity discovered its injury in May 1989 and held that there were two earlier episodes in early 1988 and December 1988 when Trinity knew or should have known of its injury. The first occurred when the building experienced serious structural damage and the second happened when the damage reoccurred after extensive repairs had been made. The court concluded that Trinity discovered its injury in early 1988 and the notice given on August 31, 1989, was untimely. It reaffirmed the grant of summary judgment in Westminster's favor.

No evidentiary hearing or oral argument was held in this case. In its December 10, 1990 motion for reconsideration, Westminster asked for the opportunity to present the court "with a full and fair legal and factual background" relevant to its motion. Similarly, in its December 26, 1990 motion

for reconsideration, Trinity asked for a hearing to present oral argument.

There is an obvious conflict between the trial court's orders of December 18, 1990 and January 28, 1991 regarding when Trinity discovered its injury. In the first order, the trial court held that the injury had been discovered in May 1989 and in the second order it concluded that the injury was discovered in early 1988. The notice given would have been timely under the first ruling but untimely under the second. The trial court's rationale for its change of discovery dates is unclear. It is uncertain what, if any, effect the trial court gave to Westminster's concession regarding Trinity's discovery of its injury. The concession itself is somewhat ambiguous but it may have been the basis for the trial court's finding in its December 19, 1990 order that Trinity discovered its injury in May 1989. Certainly the parties were confused regarding which party bore the burden of proof and what was the test for discovery of injury. Under the circumstances, the trial court should have held a hearing as requested by the parties. Such hearing would have permitted the full development of a factual record and determination of the proper legal test to be applied.

■ Trinity's claims are based on continuing trespass caused by the migration of water from Westminster's water tanks or water mains to Trinity's property. Trinity was injured when the water entered its property and that injury could have been discovered if soil tests had shown an abnormal amount of water present in Trinity's soil. No such discovery occurred. Rather, the parties agree that the injury was manifested by structural damage to Trinity's building. The question is when Trinity knew or should have known that the building was damaged by the tortious act of another rather than a naturally occurring phenomenon such as pre-existing soil conditions.

■ The Governmental Immunity Act does not permit an injured party to ignore

---

12. In fact, an action under the Act cannot be commenced until either the public entity has denied the claim (which occurred here on December 27, 1990) or ninety days has passed after filing notice, whichever occurs first. § 24–10–109(6), 10A C.R.S. (1988).

evidence which would cause a reasonable person to know that he or she has been injured by the tortious conduct of another. The Act's notice period places a burden on the injured party to determine the cause of the injury, to ascertain whether a governmental entity or public employee is the cause, and to notify the governmental entity within 180 days from the time when the injury is discovered. Thus, in this case, the date of discovery is not postponed until Trinity knew or should have known that Westminster was the source of trespassing water. It is enough to trigger the notice period if Trinity knew or should have known that the structural damage to the building resulted from an abnormal amount of water in ground soil.

On remand, the trial court should handle this issue under Rule 12(b)(1) and conduct such further proceedings as may be necessary to determine whether Trinity gave timely notice to Westminster under the Governmental Immunity Act.

## C.

■■ Finally, Trinity argues that the notice provision of section 24–10–109, 10A C.R.S. (1988), is unconstitutional as violative of due process of law. Trinity does not appear to argue that it has been deprived of procedural due process, but rather that its right to obtain judicial resolution of a dispute involving a public entity has been violated.

In *Evans v. Board of County Comm'rs*, 174 Colo. 97, 105, 482 P.2d 968, 972 (1971), we recognized that the General Assembly has the discretion to restore sovereign and governmental immunity in whole or in part, or to place limitations upon the actions that may be brought against the state or its subdivisions. Because, as we have said many times, the notice period rationally furthers a legitimate state interest, *Uberoi v. University of Colorado*, 713 P.2d 894, 899 (Colo.1986); *Fritz v. Regents of the University of Colorado*, 196 Colo. 335, 338–39, 586 P.2d 23, 25 (1978); *Antonopoulos v. Town of Telluride*, 187 Colo. 392, 398, 532 P.2d 346, 349–50 (1975), a facial

due process challenge to the notice provision is unavailing.

Because we are remanding this case for the trial court to determine when Trinity discovered its injury, it would be premature to address Trinity's argument that the 180–day notice period was unconstitutional as applied to it if the injury was discovered in early 1988. We will address Trinity's contention that the notice period is unconstitutional as applied to it *unless* discovery of the injury is deemed to have happened in late April or early May 1989. That is the time when its soil engineer, Robert Maury, informed Trinity that excess groundwater caused the building's structural damage and that Westminster's water tanks were a possible source of that water. Trinity's position is that the 180–day notice period cannot begin to run until it discovered the cause of its injury and the identity of the likely tortfeasor. Assuming, without deciding, that a Governmental Immunity Act claimant would have a valid due process challenge if it showed that it had insufficient opportunity to gather the information needed to comply with the Act's notice provision, we reject Trinity's argument.

Trinity bears the burden of proving beyond a reasonable doubt that the notice provision is unconstitutional as applied to it. Under section 24–10–109(2), a notice must set forth the following:

(a) The name and address of the claimant and the name and address of his attorney, if any;

(b) A concise statement of the factual basis of the claim, including the date, time, place, and circumstances of the act, omission, or event complained of;

(c) The name and address of any public employee involved, if known;

(d) A concise statement of the nature and the extent of the injury claimed to have been suffered;

(e) A statement of the amount of monetary damages that is being requested.

■■ In *Woodsmall v. Regional Transportation District*, 800 P.2d 63 (Colo.1990), we discussed what constituted "compliance" with the notice requirement. There, we held that absolute compliance was not

necessary but that substantial compliance is sufficient. The notice requirement may be satisfied even if certain elements are missing or are not precisely set out, such as the exact nature of the injury and the exact monetary value of the claim. Such lack of detail may be excused when the claimant's condition is of a tentative nature and a definitive prognosis is unavailable. It is immaterial that, within 180 days of the discovery of its injury, Trinity may not have known precisely the "nature and extent of the injuries" actually suffered by the building or the exact amount of damages. All that is required is "a good faith effort to include within the notice, to the extent the claimant is reasonably able to do so, each item of information listed in section 24–10–109(2)." *Woodsmall*, 800 P.2d at 69.

Trinity relies on our decision in *State v. Young*, 665 P.2d 108 (Colo.1983), in arguing that the 180–day notice period should not begin to run until Maury informed Trinity that there was water in the soil and that it appeared to have come from Westminster's water tanks. In *Young* we held "that there must be a reasonable opportunity for a claimant to discover the basic and material facts underlying a claim before she is duty-bound to give the statutory notice required by section 24–10–109(1)." *State v. Young*, 665 P.2d at 111.

Trinity's reliance on *Young* is misplaced.[13] In *Young*, we were concerned that the ninety-day notice period[14] might be too short for a person to determine who or what had injured her and how it had done so. In that case, however, the plaintiff clearly had taken early, positive steps to discover the basis of her claim by seeking to obtain and obtaining the docket sheet. While in *Young* we stated that "there must be a reasonable opportunity for a claimant to discover the basic and material facts underlying a claim before she is duty-bound to give the statutory notice required by section 24–10–109(1),"

665 P.2d at 111, we also stated that "section 24–10–109(1) does not allow an aggrieved party to wait to file its action until all of the elements of the claim mature." *Id.* We implied, as we now hold, that a plaintiff has a duty of reasonable diligence to determine the basic and material facts underlying a potential claim against a government entity.

From the information before us, it appears that Trinity was not at all diligent prior to April or May 1989. Four months passed by without explanation while Trinity failed to hire an engineer or take other appropriate steps to investigate the cause of the foundation cracking. The engineer completed his soil investigation in about a month, but, again without explanation, four more months passed before Trinity notified Westminster that it believed that a leaking water tank or water main caused the building's foundation problems.

Trinity has not proved beyond a reasonable doubt that the notice requirement is unconstitutional as applied to it because it could not have discovered information to give Westminster a timely notice of claim sufficient in terms of section 24–10–109(2) prior to April or May 1989.

### IV.

Because Trinity did not state a claim for inverse condemnation, we affirm the decision of the district court granting summary judgment on that issue in favor of Westminster. We reverse the granting of summary judgment on the Governmental Immunity Act notice issue. We also hold that the notice requirement is not facially unconstitutional and Trinity has failed to prove the Act is unconstitutional as applied to it for any discovery date prior to April or May 1989. The case is remanded for further proceedings consistent with this opinion.

LOHR, J., concurs in part and dissents in part, and KIRSHBAUM and VOLLACK, JJ., join in the concurrence and dissent.

---

**13.** Westminster argues that the Legislature overruled *Young* in 1986. Because of our disposition of this issue, we do not need to address Westminster's argument.

**14.** Under the statute then in effect, the notice period was ninety days. At all times applicable to the present case, the notice period is 180 days.

Justice LOHR concurring in part and dissenting in part:

I agree with the majority's decision insofar as it affirms the district court's dismissal of the inverse condemnation claim of Trinity Broadcasting of Denver, Inc. (Trinity) on the basis that Trinity failed to present evidence that the City of Westminster (Westminster) intentionally acted in such a way that the natural consequence of its acts would result in a taking of Trinity's media center building. *See* maj. op. at 922. Furthermore, because I believe that a factual dispute exists as to the date on which Trinity discovered its injury I agree that the case should be remanded to the district court for a determination as to whether Trinity filed timely notice under the Governmental Immunity Act, § 24–10–109(1), 10A C.R.S. (1988 & 1992 Supp.) (the Act). I respectfully dissent, however, to the part of the majority opinion that holds that the district court erred in considering this matter pursuant to Westminster's motion for summary judgment and that it should have addressed Trinity's compliance with the statute in accordance with principles of dismissal for lack of subject matter jurisdiction under C.R.C.P. 12(b)(1). *See* maj. op. at 925. I believe that under the circumstances of this case a decision on summary judgment was a proper means of addressing the jurisdictional question. Furthermore, I disagree with the majority's treatment of the constitutional issue in part IIIC of its opinion. The district court has yet to determine the date on which Trinity discovered its injury, and any consideration by this court of whether the 180–day notice period is unconstitutional as applied presupposes a finding that Trinity discovered its injury at some point before late April or early May 1989. I therefore would hold that consideration of the constitutional issue is premature.

I

In part IIIB of its opinion the majority concludes that the district court should have resolved Westminster's summary judgment motion for the alleged failure of Trinity to file timely notice under section 24–10–109(1) pursuant to the principles of dismissal for lack of subject matter jurisdiction under C.R.C.P. 12(b)(1) and that the court erred in dismissing Trinity's action on summary judgment. Maj. op. at 924–25. I agree with the majority to the extent that it holds that it is the role of the district court rather than of the jury to make the pretrial determination of whether Trinity complied with the statute's notice requirement. *See id.* at 924. I disagree, however, that the jurisdictional question of timely notice is one that could not be resolved on summary judgment. Upon consideration of the differences between a ruling on summary judgment and one under C.R.C.P. 12(b)(1), I am satisfied that the district court appropriately addressed Westminster's argument in the procedural form that Westminster presented it in its motion for summary judgment.

Summary judgment is a drastic remedy warranted only upon a clear showing that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. C.R.C.P. 56; *Civil Serv. Comm'n v. Pinder*, 812 P.2d 645, 649 (Colo.1991); *Churchey v. Adolph Coors Co.*, 759 P.2d 1336, 1339–40 (Colo.1988). Because it acts as a final judgment on the merits of a party's claim, dismissal of an action under summary judgment bars subsequent actions on the same claim. *Winslow v. Walters*, 815 F.2d 1114, 1116 (7th Cir.1987) (summary judgment on issue of whether party failed to state a claim on which relief can be granted constitutes a decision on the merits with full res judicata effect); *cf. City & County of Denver v. Block 173 Assocs.*, 814 P.2d 824, 830–31 (Colo.1991) (except as to state claims that were pendent and thus not available in the federal forum after dismissal of federal claim, dismissal of federal claim on summary judgment will bar a state action on any other claims for relief that could have been brought in the federal proceeding). The party moving for summary judgment must establish the lack of a triable factual issue, and any doubts as to the existence of such an issue must be resolved against that party. *Elm Distrib. v. Tri–Centennial Corp.*, 768 P.2d 215, 218 (Colo.1989); *Chur-*

*chey,* 759 P.2d at 1340. Furthermore, in determining whether summary judgment is appropriate, a court must give the party opposing such judgment the benefit of all favorable inferences that may be drawn from the facts contained in the record. *Churchey,* 759 P.2d at 1340; *Kaiser Found. Health Plan v. Sharp,* 741 P.2d 714, 718 (Colo.1987).

In contrast, when a question is raised as to whether a particular court has subject matter jurisdiction over an action, it is the party asserting jurisdiction that bears the burden of establishing that jurisdiction exists. *Reynolds v. Army and Air Force Exch. Serv.,* 846 F.2d 746, 748 (Fed.Cir. 1988); 2A *James W. Moore et al., Moore's Federal Practice* ¶ 12.07[2.–1], at 12–46 (2d ed. 1992) (hereinafter *Moore's Federal Practice* ). A court presented with a motion to dismiss under Rule 12(b)(1) is empowered to resolve any factual disputes as to the jurisdictional issue. *Chatham Condominium Ass'ns v. Century Village, Inc.,* 597 F.2d 1002, 1012 (5th Cir.1979). If the court grants such a motion, its ruling, unlike a grant of summary judgment, is not on the merits and therefore will not have res judicata effect except as to the question of jurisdiction. *Winslow,* 815 F.2d at 1116. A party opposing a motion to dismiss under 12(b)(1) generally has fewer safeguards than would a party defending a motion for summary judgment. *Boyle v. Governor's Veterans Outreach Assistance Ctr.,* 925 F.2d 71, 74–75 (3d Cir.1991) (motion filed under Fed.R.Civ.P. 12(b)(6) and treated as motion for summary judgment because of presentation of matters outside the pleadings " 'provides further safeguards for the plaintiff' ") (quoting *Mortensen v. First Fed. Sav. and Loan Ass'n,* 549 F.2d 884, 891 (3d Cir.1977)); *accord Chatham Condominium Ass'ns,* 597 F.2d at 1011–12; 2A *Moore's Federal Practice* ¶ 12–07[2.–1], at 12–50 to –51.[1]

In the present case, it is clear that Westminster could have sought dismissal of Trinity's claim under C.R.C.P. 12(b)(1).

However, under the principles set forth above, the fact that it filed a motion for summary judgment, and consequently accepted the added burden of showing a lack of any triable factual issue in a context where Trinity's uncontroverted allegations must be presumed to be true should not provide a basis for concluding that the district court's resolution of the motion as filed was in error. In my view, it was entirely proper for that court to consider whether a genuine issue of material fact existed as to Trinity's compliance with the statute's notice provision under a standard more favorable to Trinity than would have been applicable had the court resolved the issue pursuant to C.R.C.P. 12(b)(1). Here, subject matter jurisdiction depended upon a factual determination of timeliness of notice. Westminster elected to attempt in the first instance to obtain a ruling that there was no genuine issue of fact concerning timeliness, and that the notice was untimely. Resolution of the issue in this manner would have obviated the necessity for an evidentiary hearing. Neither party contested the appropriateness of the summary judgment proceeding, and neither suggested, in the trial court or before us on appeal, that jurisdiction must be determined under procedures applicable to resolution of a motion to dismiss under C.R.C.P. 12(b)(1).

I do recognize that authority exists for the view that the question of a court's subject matter jurisdiction should not be raised in a motion for summary judgment but rather should be presented to the court in a motion to dismiss under Rule 12(b)(1). *See, e.g., Indium Corp. of America v. Semi–Alloys, Inc.,* 781 F.2d 879, 883–84 (Fed.Cir.1985) (because motion for summary judgment was premised on district court's asserted lack of subject matter jurisdiction, the matter should have been raised in a motion to dismiss under 12(b)(1)), *cert. denied,* 479 U.S. 820, 107 S.Ct. 84, 93 L.Ed.2d 37 (1986); *Studio Elec. Technicians v. International Photogra-*

---

1. *E.g.,* in a summary judgment proceeding all of a plaintiff's uncontroverted allegations and all favorable inferences that can be drawn from them are taken as true, and a trial court cannot grant summary judgment unless there is no genuine issue of material fact. *Boyle,* 925 F.2d at 74–75; *Mortensen,* 549 F.2d at 891.

*phers of Motion Picture Indus.*, 598 F.2d 551, 552 n. 2 (9th Cir.1979) (parties' motion for summary judgment based on district court's lack of subject matter jurisdiction inappropriate and court should have treated it as a motion to dismiss); 6 *Moore's Federal Practice* ¶ 56.03, at 56–56 ("lack of jurisdiction over the subject matter should be raised by a motion to dismiss or in the responsive pleading and not by a motion for summary judgment"). A principal basis for this view, however, is that matters in abatement, which merely result in an action being dismissed without prejudice based on some procedural defect or erroneous choice of forum and which do not bar a party from reasserting its claims, need not invoke the protections provided to a nonmoving party in a summary judgment proceeding. *See generally id.* at 56–58. *Moore's Federal Practice* lists subject matter jurisdiction as an example of a matter in abatement. *Id.* at 56–55. Here, however, a determination of timeliness of notice adverse to Trinity would serve as a complete bar to future assertions of its claim. Thus, the foregoing rationale for requiring resolution of a subject matter jurisdiction issue by a 12(b)(1) motion rather than by a motion for summary judgment is not applicable.

Although it is often stated that a court's lack of subject matter jurisdiction over an action is most appropriately raised in accordance with Rule 12(b)(1), courts have not adhered to such a rigid application of this principle that its purpose, grounded in the distinctions between summary judgment and 12(b)(1) dismissals, is not served. As stated in *Moore's Federal Practice:*

[s]ince the label attached to a motion is unimportant, a motion for summary judgment for lack of jurisdiction over the subject matter may be treated and disposed of by the district court as a motion to dismiss. Conversely, where a motion to dismiss directed to subject matter jurisdiction ... in fact goes to the merits, the court may treat the motion as one for summary judgment. The important thing is that a judgment, which is not on the merits, be correctly denominated as one without prejudice.

*Id.* at 56–58 to –59 (footnotes omitted). Thus, in *Cizek v. United States,* the Tenth Circuit Court of Appeals stated that "[a] Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction should be considered under Fed.R.Civ.P. 56, if the jurisdictional issue is 'intertwined with the merits of the case.'" 953 F.2d 1232, 1233 (10th Cir.1992) (quoting *Redmon ex rel. Redmon v. United States,* 934 F.2d 1151, 1155 (10th Cir.1991)). In *Cizek,* the government sought dismissal pursuant to Fed.R.Civ.P. 12(b)(1) of a plaintiff's action for damages under the Federal Tort Claims Act on the ground that the plaintiff had failed to comply with that act's notice requirement. The court determined that it was error for the district court to transform the government's 12(b)(1) motion to a motion for summary judgment. 953 F.2d at 1233. Although the majority reads *Cizek* as support for its view that in Trinity's case the district court should have treated Westminster's motion for summary judgment as a motion to dismiss under Rule 12(b)(1), *see* maj. op. at 925, the case stands only for the principle that when a party requests dismissal under Rule 12(b)(1) and the circumstances do not suggest that summary judgment would be more appropriate, a court ought to give effect to the procedural form chosen by the party and make its determination under that rule. *See also Chatham Condominium Ass'ns,* 597 F.2d at 1011–12 ("When jurisdictional issues are intertwined with the merits, the adjudication of the jurisdictional issue in accordance with the procedure under a 12(b)(1) motion fails to offer the procedural safeguards attendant upon proceedings under ... a motion for summary judgment under Rule 56" and therefore should be deferred to a consideration of the merits).

In accordance with the flexibility shown by courts in applying these two procedures for dismissal, I believe that the circumstances in the present case warrant a reasoned conclusion that summary judgment was an appropriate means of resolving Westminster's motion. Section 24–10–109 requires "[a]ny person claiming to have

suffered an injury by a public entity ... [to] file a written notice ... within one hundred eighty days after the date of the discovery of the injury." It states further that any failure to comply with this requirement "shall forever bar any such action." This makes clear that any determination that Trinity failed to file timely notice will act as a complete bar to any subsequent action that it may bring. This will be true regardless of whether the determination is made on summary judgment or pursuant to a motion to dismiss under 12(b)(1). Consequently, even if the district court had addressed the question of its jurisdiction under C.R.C.P. 12(b)(1), Trinity would not have benefitted from the protections against res judicata that the rule would ordinarily provide. Because the usual justifications for proceeding under C.R.C.P. 12(b)(1) do not exist in this case, I see no basis for finding error in the district court's treatment of Westminster's motion for dismissal. If Westminster believed that it could prevail under the strict summary judgment standards by showing the nonexistence of any genuine issue of material fact as to Trinity's compliance with the statute's notice requirement, it should have been allowed to test the sufficiency of Trinity's claims by such a motion—as the district court did—rather than be compelled to proceed through an evidentiary hearing which would produce the same result. Thus, I cannot agree with the majority's finding of error and would review the district court's dismissal of Trinity's action pursuant to the principles of summary judgment set forth above.

## II

On review of the district court's ruling, I believe that the record shows a disputed issue of material fact as to when Trinity discovered its injury and on that basis would reverse the dismissal of Trinity's action and remand the case for an eviden-

tiary hearing to determine whether Trinity complied with the Act's notice requirement.[2]

As shown above, under section 24–10–109(1), Trinity was required to file written notice of its claims within 180 days "after the date of the discovery of the injury." "Injury" is statutorily defined as follows:

"Injury" means death, injury to a person, damage to or loss of property, of whatsoever kind, which, if inflicted by a private person, would lie in tort or could lie in tort regardless of whether that may be the type of action or the form of relief chosen by a claimant.

§ 24–10–103(2), 10A C.R.S. (1988). The written notice required by section 24–10–109(1) "shall contain" information including "[a] concise statement of the factual basis of the claim, including the date, time, place, and circumstances of the act, omission, or event complained of" and "[t]he name and address of any public employee involved, if known." § 24–10–109(2)(b), (c), 10A C.R.S. (1988).

Taken in combination, these statutes require at a minimum that before the 180–day notice period of section 24–10–109(1) will begin to run against a tort claim for property damage, the claimant must have discovered that he or she has been injured. See maj. op. at 923. Because "injury" connotes a tortious cause, see § 24–10–103(2), discovery of an injury involving damage to property necessarily requires discovery that the damage resulted from such a cause. See maj. op. at 923 (requiring that a claimant discover that he or she has been "wrongfully injured"). The majority opinion states that discovery of the injury occurs if such injury is known or should have been known by the exercise of reasonable diligence. Id. at 923–24. Accepting this standard for the purpose of this opinion,[3] the record presents a genuine issue of ma-

---

**2.** The majority holds that any review of the facts to be found in the evidentiary hearing on remand should be governed by the "clearly erroneous" standard. Maj. op. at 925. The parties have not had an opportunity to brief or argue this issue, so I would not address it.

**3.** See State v. Young, 665 P.2d 108, 109 (Colo. 1983) (suggesting that "discovery of the injury" in § 24–10–109(1) incorporates the tort standard of "knew or should have known," applicable in determining the time a cause of action accrues).

terial fact as to when Trinity knew or should have known this information.

The following information is gleaned from the affidavits and other materials properly before the district court in ruling on Westminster's motion for summary judgment. In 1983, before construction began on the media center building, Trinity obtained a report from an architect noting adverse, expansive soil conditions at the site and in the general area. In particular, the report noted that a nearby church had experienced badly heaved floor slabs. The architect recommended that Trinity obtain a soils report before proceeding "to ascertain whether or not there is subsurface water or other unusual conditions attributable to the nearby water tanks (possible leakage)." The architect also observed that "[t]he proposed building will have to be set on cassions [sic] with grade beams due to soil conditions." Trinity obtained a soils report in November of 1983. Five holes were drilled to a depth of twenty feet and no free water was encountered. The report noted that the soils were expansive and presented "a definite risk of future damage" if a "slab on grade" form of construction were adopted. In 1985, an engineer with Stewart Engineering, Inc. examined the site after excavation for the building had been accomplished. In his report he noted that "[s]everal erratic areas of soil were revealed, as evidenced by soft, moist pockets of clay soil." The engineer also observed that he had previously recommended a foundation system of drilled piers, as also indicated in the 1983 soils report, but that the owner decided to proceed with a slab on grade foundation system—an inadequate foundation design in the engineer's opinion, and one subject to "a very high risk of differential movement and cracking." The engineer also noted the moisture content of the expansive soil under the building was "expected to increase in a disproportionate manner over the first few years after construction due to the erratic soil composition and irrigation."

In the fall of 1987, the newly constructed media center experienced cracking in the floors and walls. An I-beam was being pulled out of a concrete wall, and floor slabs were separating. Trinity's chief engineer, James A. Riddle, averred that Trinity "thought the building was just settling a little more than normal." The cracking worsened, and early in 1988 Trinity engaged 3–D Piering to evaluate the problem. According to Riddle, 3–D Piering advised that "there seemed to be some instability in the foundation of the building, which we thought at that time to be simply the result of compressing soil." 3–D Piering installed a number of steel piers under the building in the spring of 1988, halting the cracking for a time. In December 1988, cracking began once more. Trinity began to look for an engineer to investigate the cause of the cracks. According to Riddle's affidavit, "[a]fter some initial difficulties in finding engineers who could do the work, [Trinity was] able to hire Robert L. Maury as a soil engineer in April of 1989."

Maury took soil samples and discovered free water in the soil around and under the building. He concluded that the water was introduced sometime between the 1983 soil investigation and his own drilling, that soil expansion resulting from the water was a major cause of the structural problems, and that leakage from Westminster's water tanks or mains was the most likely source of the water. He advised Trinity of this in late April or early May of 1989. Maury related that "[t]he Trinity personnel appeared surprised to learn that Westminster's water tanks were a probable cause of their building's structural problems." Riddle corroborated the content and timing of this information from Maury. Riddle averred, "[s]o far as I am aware, until our discussions with Mr. Maury, it had never occurred to anyone at Trinity that the tanks or water mains might be leaking, or that the City of Westminster might be responsible in any way for the problems we had experienced with our building."

As reflected by the foregoing summary, the record at a minimum creates a genuine issue of material fact as to when Trinity knew or should have known that the damage to its media center was caused by leakage of water from Westminster's tanks

or mains. The initial suggestion in the 1983 architect's report that the water tanks might be leaking appeared negated by the later soils report. A nearby church was experiencing structural problems in 1983, evidently in absence of such leakage. Trinity knew the soil was expansive and that moisture buildup around and under the building could be expected after construction. It also knew that it had ignored engineering advice not to employ a slab on grade foundation design.

Giving Trinity the benefit of all favorable inferences that may be drawn from facts contained in the record and resolving all doubts about the existence of a genuine issue of material fact against Westminster, as we must, the record establishes a genuine issue of fact as to whether Trinity knew or should have known by the exercise of reasonable diligence prior to April or May of 1989 that the structural damage could be attributed to something other than natural causes. Based on the existence of this factual question, I cannot agree with the district court that there is no genuine issue but that Trinity discovered its injury early in 1988. Consequently, I agree we should remand the case so that the district court can resolve in an evidentiary hearing the question of when Trinity discovered its injury for the purpose of triggering the Governmental Immunity Act's 180–day notice provision.

### III

As a final matter, I do not agree that the majority is correct in proceeding to determine whether the 180–day notice requirement is unconstitutional as applied to Trinity if it is deemed to have discovered its injury at any time prior to late April or early May of 1989. *See* maj. op. at 927. Our precedents make clear that we should not address the constitutionality of the application of a statutory requirement unless the matter has first been presented to the district court. *Colgan v. State of Colorado Dep't of Revenue*, 623 P.2d 871, 874 (Colo.1981) (where district court was not presented with constitutional challenge to a statute, Supreme Court will not consider

issue for the first time on appeal); *accord Manka v. Martin*, 200 Colo. 260, 263–64, 614 P.2d 875, 877 (1980), *cert. denied*, 450 U.S. 913, 101 S.Ct. 1354, 67 L.Ed.2d 338 (1981). Nor are we to resolve issues that are not essential to the disposition of an action. *Mountain States Beet Growers Mktg. Ass'n v. Monroe*, 84 Colo. 300, 308, 269 P. 886, 888 (1928) ("It is the general rule and practice both in the federal and state courts not to pass upon constitutional questions unless it is essential to the disposition of the pending cause."). Because we need not resolve the constitutionality of the statute's application for the district court to resolve the jurisdictional issue and because the court may well resolve that issue in a way that such review will never be necessary, I find the majority's treatment of this issue premature.

KIRSHBAUM and VOLLACK, JJ., join in this concurrence and dissent.